(C. D. 1001)

NATIONAL CARLOADING CORP. ET AL. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided April 25, 1946)

*Eugene R. Pickrell* for the petitioners.

*Paul P. Rao,* Assistant Attorney General (*Dorothy C. Bennett,* special attorney), for the respondent.

Before CLINE, KEEFE, and EKWALL, Judges

EKWALL, Judge: These two petitions for remission, filed under section 489 of the Tariff Act of 1930, have been consolidated. They seek remission of additional duties assessable for undervaluation on entry of 31 importations at the port of New York and 2 at the port of Philadelphia. The merchandise consists of sodium hydrosulphite imported from Czechoslovakia during the period from April 1938 to May 1, 1939. The blue purchase form consular invoice was used in which Arthur A. Lehmann Co., Inc., of New York was named as purchaser and the United Chemical and Metallurgical Works, Ltd., of Prague, Czechoslovakia, as the seller. In the case of petition 6484–R, entry was made at the port of New York by the National Carloading Corp. and in petition 6483–R by Morris Friedman at the port of Philadelphia. These entrants are customs brokers who made entry in their own names, no owners' declarations having been filed, which under the provisions of section 485 (d) of the Tariff Act of 1930 and article 300 of the Customs Regulations of 1937 would have relieved them from liability for payment of additional duties.

The price as invoiced was 11 cents per pound c. i. f. New York, packing included. The invoices also contain the following statement: "Home market value, taxes included, is 3 per cent higher than the invoice price." Entry was made in each case at 11 cents per pound less nondutiable charges, plus 3 per centum, on the basis of foreign value. All of the importations were appraised at a foreign value of 9.90 koruna per kilo, less 2 per centum cash discount, packed, plus 3 per centum turnover tax, which represented an advance of over 50 per centum.

In both the New York entries and the Philadelphia entries inquiry sheets as to value were submitted by the customhouse brokers to the Government officials who passed upon this type of merchandise. Subsequently, but prior to appraisement, Arthur A. Lehmann Co., Inc., submitted information to the Government examiners concerning prices and conditions under which sodium hydrosulphite was sold both for home consumption in Czechoslovakia and for export to foreign countries. This information had been obtained from the manufacturer and shipper of this sodium hydrosulphite.

Appeals for reappraisement from the appraisers' finding of value were filed in each case by Arthur A. Lehmann Co., Inc., but were subsequently abandoned.

At the hearing the petitioners produced the testimony of five witnesses and the Government introduced the testimony of the customs examiner at the port of Philadelphia who had advisorily appraised the importations covered by petition 6483–R.

The witnesses on behalf of the petitioners consisted of Mr. Arthur A. Lehmann, the president of Arthur A. Lehmann Co., Inc., the pur-

chaser, during the years 1938 and 1939; Mr. Fred Clausmeyer, vice president and office manager of that company; Mr. Henry B. Edgar, entry clerk employed by the National Carloading Corp., which concern acted as customs brokers and made entry in its own name in connection with the importations covered by petition 6484–R; Mr. Morris Friedman, the Philadelphia customs broker, who made entry of the Philadelphia importations, and filed petition 6483–R; and Mr. Henry Rosenthal, the customs examiner at the port of New York in 1938 and 1939.

Mr. Lehmann produced contracts between the foreign manufacturer and the Arthur A. Lehmann Co., Inc., covering all the importations of sodium hydrosulphite involved in these petitions. By these contracts the Lehmann Co. was given exclusive selling rights in this country for this manufacturer's sodium hydrosulphite. Under the terms thereof the Lehmann Co. sold the importations of this merchandise in the United States, paid the customs duties, and billed its customers, and after deducting 4 per centum as commission and the amount of the customs duties, paid the balance to the National City Bank for remittance to the manufacturer in Czechoslovakia.

The Lehmann concern also stored sodium hydrosulphite in this country from time to time, paid the storage charges and insurance, guaranteed the credit of its customers, in four or five instances made good when customers failed to pay, sent monthly copies of their invoices to their customers to the shipper, also monthly statements of expenditures, and periodically sent reports regarding marketing conditions as to sodium hydrosulphite in this country.

It further appears from the testimony of this witness that the Treasury Department conducted an investigation under the Antidumping Act of 1921 in connection with these importations, and that the Secretary of the Treasury as a result of that investigation made a finding of no dumping.

During the course of the investigation and while appraisements of these importations were being withheld by the local appraiser, the Lehmann concern made inquiry from the manufacturer as to the sales and conditions of sales of this commodity in Czechoslovakia for home consumption and also for export to foreign countries. The information received from the manufacturer, which was in the form of a questionnaire and letters, was turned over to counsel for the petitioners by Mr. Lehmann. Appeals for reappraisement were duly filed from the finding of value made by the appraiser. An affidavit was sent to the manufacturer to be executed by a person having knowledge of the facts as to the sales and conditions of sales of this commodity for home consumption and also for export. The Lehmann Co. was advised by the manufacturer that the affidavit was returned duly executed, but it was never received by said Lehmann Co. The

plant of the manufacturer was occupied by the Nazis. Mr. Lehmann located the executive of the plant in this country and conferred with him, but was advised that he had no knowledge as to the prices at which this commodity was sold in Czechoslovakia. This witness also testified that during the course of an investigation involving a question as to the proper form of invoice for these transactions he had shown all the records and files of Arthur A. Lehmann Co., Inc., to the United States customs agent.

Mr. Fred Clausmeyer testified as to the method of ordering this merchandise and as to the dealings of the Lehmann Co. with the National City Bank in this connection and stated that he advanced the customs duties to the National Carloading Corp., who acted as customs brokers. This witness stated it as his belief that he conferred with the Government examiner relative to these importations; that he did not conceal any information from him nor misrepresent the facts. He did not show the contracts to the examiner, neither did he show him the reports made by his company to the manufacturer, nor did he show them to his customs broker.

Mr. Edgar testified that he had been entry clerk for the National Carloading Corp., the customs brokers, for about 25 years during 15 of which he had handled entries. At the time of the trial he was import manager for that concern. As entry clerk he prepared the entries covered by petition 6484–R or they were prepared under his supervision as were also the submission sheets. The submission sheets were submitted to Examiner Rosenthal and either Mr. Rosenthal or his clerk made a notation thereon reading "Ascertain from shipper the correct foreign or export value." The National City Bank sent him the consular invoices and bills of lading covering these importations with instructions to pay the duty and not to file an owner's declaration; to get the customs duties from the Arthur A. Lehmann Co., Inc. These instructions he complied with. When the submission sheets were returned with the notation noted above, they endeavored to obtain information from the National City Bank as to the market value of this merchandise but the bank had no information and instructed them to get in touch with Arthur A. Lehmann Co., Inc. However, the Arthur A. Lehmann Co., Inc., had no information. The witness then entered at the invoice unit price of 11 cents per pound less nondutiable charges, plus 3 per centum, which he considered represented the foreign value. The witness testified that in making entry as he did he had no intention of defrauding the revenues of the United States and that he did not conceal any information from the customs authorities nor misrepresent any of the facts to the examiner or appraiser and that he gave the Government examiner all the information he had prior to making entry.

On cross-examination this witness stated that he had not been shown the contract between the Arthur A. Lehmann Co., Inc., and the foreign manufacturer, nor was he told that that firm was working on a commission basis, nor that they were the foreign manufacturer's agents in this country. He explained that he did not communicate with the shipper as to the foreign or export value because he left it to the importer to ascertain from the shippers the foreign or export values.

The witness stated that in his discussions with customs examiners prior to making entry the conversation as a rule is limited to matters of value; that he does not go into the question of the owner's declaration as that is a matter connected with the collector and not the appraiser's staff. Further he stated that he did not know at any time that the value of this merchandise was under investigation by the customs authorities.

In regard to the Philadelphia entries covered by petition 6483–R, Mr. Friedman, who filed these entries, testified that he had been in the customs brokerage business in Philadelphia for about 26 years; that he represented the National Carloading Corp. in Philadelphia; that prior to making these entries he had received the consular invoices and bills of lading from the National Carloading Corp. of New York, and that said concern supplied him with funds for payment of the duty.

Pursuant to instructions from the National Carloading Corp., he presented the invoice to the Philadelphia appraiser prior to entry, together with submission sheets. The submission sheets referred to are a part of the record herein. Mr. Friedman stated that he did not remember just what happened when he submitted these sheets to the examiner; whether he was asked to obtain information regarding the proper market value or not. He did not obtain an owner's declaration because such was not his practice unless "we knew as a matter of fact there might be some question regarding values, and in this particular instance I don't suppose we knew that there would be any question on it until after the 90-day period for the time of filing an affidavit has passed." Appeals for reappraisement were filed on these two Philadelphia importations. In making entry as he did he obtained his information from the consular invoice; and did not misrepresent any facts to the examiner or appraiser, nor did he intend to deceive the Government officials. It further appeared that the examiner again conferred with this witness prior to appraisement relative to the value of the merchandise and told him that there was a possibility of the value being advanced and asked that the entries be amended, but that Mr. Friedman's instructions from the National Carloading Corp., with whom he conferred, were not to amend the entries but to leave the values as shown on the consular invoice.

These instructions were received subsequent to the examiner's suggestion that the entries be amended.

Mr. Rosenthal, the United States customs examiner at the port of New York during the time these importations were made, testified that he examined and advisorily appraised the importations involved in the New York petition (6484–R); that submission sheets were submitted to him covering these importations; that he based his advisory appraisements upon a report made by Treasury Agent Clark; and that statements contained in a brief subsequently filed with the Commissioner of Customs by petitioners' counsel during the course of an investigation under the Antidumping Act of 1921, correspond with the information set forth in the Treasury agent's report upon which he based his appraisement. This witness also testified that petitioners' counsel showed him the questionnaire setting forth information as to sales and conditions of sales of sodium hydrosulphite for home consumption in Czechoslovakia and for export to foreign countries in November 1938. The witness further testified that petitioners' counsel discussed the question of the value of this merchandise with him prior to appraisement and that both the Arthur A. Lehmann Co., Inc., and the National Carloading Corp. conferred with him before entry in regard to these importations.

In regard to the entry made at the port of Philadelphia, covered by petition 6483–R, the Government produced the testimony of Mr. Clarence K. Young, United States examiner at that port, who testified that he advisorily appraised the importations covered by that petition. At the time of entry he did not have any information as to value other than that shown in the invoices, but subsequently, as the result of foreign investigation, he obtained some information. When he received the submission sheets from Mr. Friedman, he did not give him any information because he had none at that time other than the statements on the invoice. He further stated that he advised Mr. Friedman's representative shortly before appraisement to get in touch with his counsel and find out whether they wished to amend their entries and allowed him a certain time in which to obtain this information, and that he was told at the expiration of the time set, to advance the values.

Upon this record we must determine whether the petitioners, who are the customhouse brokers and importers of record, exercised good faith and did they disclose all the material facts concerning these importations at the time of entry. We are not concerned with the attitude of the Arthur A. Lehmann Co., Inc., for the reason that said company is not one of the petitioners before the court. It is not primarily responsible for payment of additional duties for undervaluation because the entries were filed in the names of the customs brokers and no owners' declarations relieving said brokers from lia-

bility for payment of additional duties were filed. This court has held in the case of *American Shipping Co.* v. *United States*, 10 Cust. Ct. 300, C. D. 771, that where entry is made by a nominal consignee and no owner's declaration is executed, the nominal consignee for tariff purposes is the owner and principal and not the agent of the owner, citing *Thomas Maginnis* v. *United States*, 61 Treas. Dec. 348, T. D. 45471; and distinguishing *Ittmann Bros.* v. *United States*, 73 Treas. Dec. 529, T. D. 49481.

From the testimony of the petitioners it is apparent that the New York petitioner was acting under instructions from the National City Bank, the financial agent for the foreign manufacturer; and as to the Philadelphia entries they were made by the Philadelphia broker who acted as the representative of the New York broker and obtained his information from said New York broker. In both cases entry was based on information contained in the consular invoices, which these brokers believed, according to their testimony, to be correct at the time of entry. There is no indication in the record that either of the customs brokers was a party to any misrepresentation of facts which may have been contained on said invoices.

From the record it is the opinion of the court that the New York brokers made a full disclosure to the appraiser of all the facts within their knowledge at the time of entry, and that the Philadelphia brokers were merely representing the New York customs brokers and acted under their instructions. We find nothing so unusual in the circumstances surrounding the transactions as to cause the New York brokers to question the form of invoice or to require that they should have made further inquiries than those they did make.

As has been held on numerous occasions each case in remission presents a state of facts peculiar to itself and it is necessary to dispose of each according to the conclusion arrived at after due consideration of the facts as presented. To announce general principles applicable to all such cases is difficult and in some respects impossible. However, the primary issue is good faith and the intentions of the importer. In the case of *Wolf & Co.* v. *United States*, 13 Ct. Cust. Appls. 589, T. D. 41453, the court summarized the quantity and quality of proof required in such cases as set forth in the leading cases as follows:

* * * Summarized, these adjudged cases announce certain fundamental facts which the petitioner must establish if he is to obtain relief: First, He must show that in undervaluing his goods he was acting in entire good faith; second, that there were no facts or circumstances known to the petitioner when he made his entry which would cause a prudent and reasonable person to question the correctness of the values given by him; third, that he has made to the collector in making his entry, a full and candid disclosure of all the material facts in his possession bearing upon the value of the merchandise imported.

Considering the instant record as a whole we find it fairly shows that petitioners at the time of making entry had no information and

knew of nothing which would raise a doubt in the mind of a reasonable and prudent man that the values they used on entry were not the true values. We further find that they had no intention of defrauding the Government or deceiving its officials and that they acted in good faith.

The petitions are therefore granted.